**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Albert Longoria,                                              Case No. 3:14CV2648

           Plaintiff

        v.                                                  **ORDER**

Autoneum North America, Inc., et al.,

           Defendants

This is an employment-discrimination case under Title VII of the Civil Rights Act of 1963,

42 U.S.C. § 2000(e), *et seq.*, and analogous state-law provisions.

Plaintiff Albert Longoria worked as a Production Supervisor for defendant Autoneum North

America, Inc. One day in late Fall, 2012, someone altered the desktop wallpaper on Longoria's

computer to display an offensive caricature of a Mexican man riding a donkey. Longoria, who is

Hispanic, complained about the incident, but the company did nothing to resolve his complaint.

Five months after this incident, and following Longoria's more recent complaints that the

issue had gone unresolved, Autoneum fired Longoria, stating that it did so because of shoddy

performance. Longoria then brought this suit, alleging that Autoneum fired him because he is

Hispanic and in retaliation for his complaints.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending is the defendants' motion for summary judgment. (Doc. 29). For the following

reasons, I grant the motion.

## Background

Autoneum makes automobile parts at two plants in Oregon, Ohio.

In June, 2011, Autoneum hired Longoria to work in the Conversion Department at its Lallendorf Road plant. There he was responsible for "direct[ing] and coordinat[ing] activities of production employees to meet/exceed budgeted expectations for Safety, Quality, Housekeeping, and Productivity on the assigned shift." (Doc. 29–3 at 34). It was also Longoria's responsibility to:

- "provide Leadership, discipline, and support to ensure the highest level of Safety . . . in manufacturing";

- "plan[ ], direct[ ], and adjust[ ] as necessary production activities and manning to meet scheduling requirements"; and

- "complet[e] new hire reviews/evaluations in a timely manner."

(*Id.* at 34–35).

### A. Letter of Concern

On September 5, 2012, Al Mackie, the Operations Manager at the Lallendorf Road plant and Longoria's direct supervisor, issued Longoria a "Letter of Concern." (Doc. 29–5 at 38–39). It identified two areas of performance that "require [Longoria's] immediate attention," as they "are not only basic in nature but more importantly are required job expectations for all of our supervisors." (*Id.* at 38).

The first concern was Longoria's failure to issue twenty-six "Employee Attendance Warning Notices."

Under Autoneum's progressive discipline policy, the company had to issue a disciplinary notice for an employee's violation of the attendance policy within five days of the employee's return to work. (Doc. 29–2 at 36–37). If Autoneum failed to do so, it could not make that infraction part

2

of the employee's disciplinary record. Thus, due to Longoria's failure to issue the twenty-six notices, the company could not hold the employees at issue accountable for their violations of the attendance policy.[1]

The second concern was Longoria's failure to evaluate "several new employees" who had been "training under [his] watch" for a period of "several weeks." (*Id.* at 38). Longoria admitted that he failed to conduct these evaluations. (*Id.* at 45).

### B. Computer-Screen Incident

One day in late October or early November, 2012, as Longoria sat down to use a shared computer in the Production Supervisors' office, he saw an ethnically offensive cartoon on the computer's background screen.

According to Longoria, a Hispanic born in the United States (*id.* at 11–12), the cartoon depicted a "short Mexican man on a donkey with a sombrero and a Poncho." (*Id.* at 29).[2] A few days later, Longoria heard his subordinates saying "how did you like your back screen on your computer" and "[l]ooked a lot like you, didn't it." (*Id.* at 5).

Longoria complained to Mackie and asked him to hold "shift meetings . . . to instruct the people on the floor that that kind of behavior would not be tolerated and that it was unacceptable." (*Id.* at 31). Mackie responded by "chuckl[ing]" and saying "he would handle it." (*Id.* at 11).

---

[1] Longoria testified that he did not issue these notices because he did not receive them in a timely fashion, meaning that they had expired before he could issue them. If that were the case, Autoneum policy required that Longoria return the expired notices to the Human Resources Department, not leave them in his desk. (Doc. 29–2 at 46). Longoria acknowledged that both courses of conduct violated company policy. (*Id.*).

[2] I believe a jury could find such a stereotyping caricature offensive, insulting, and upsetting to persons of Hispanic descent, and that Longoria understandably and reasonably viewed it as such.

A few weeks later, Longoria reported the incident to Tammy Klusmeyer, the HR Manager at Autoneum's Oregon facilities. She told Longoria that Mackie had not, as company policy required, reported the incident to HR. Klusmeyer assured Longoria there would be an investigation, but it is does not appear that Klusmeyer did anything beyond record Longoria's complaint.

Longoria testified that, once Mackie learned that he had complained to HR, Mackie threatened him on a weekly basis, saying "just remember, you go before I go." (*Id.*).

### C. Performance Issues

#### 1. Overtime Assignments

One of Longoria's duties was to assign workers to overtime shifts. Because Autoneum was a union shop, supervisors based overtime opportunities on seniority.

On January 4, 2013, a veteran employee, James Bollinger, signed up for an overtime shift. Despite Bollinger's entitlement to the shift, Longoria assigned it to a less senior employee. Bollinger successfully grieved the incident, and Autoneum had to pay both the employee who had worked the shift and Bollinger as well. Longoria admitted that this was his mistake. (*Id.* at 48–49).

Longoria committed the same mistake on January 26, again assigning a lower-seniority employee overtime work instead of giving it to the more senior worker. Once again, Autoneum had to pay overtime wages to two employees for work done by one. Longoria admitted that this was also his error. (*Id.* at 49–50).

#### 2. Production Reports

On January 9, 2013 Mackie issued Longoria a Reprimand and Warning for failing to submit accurate production reports. According to Mackie's letter:

On numerous occasion we have met informally regarding production reporting inaccuracies. At the conclusion of these informal meetings, you have accepted full responsibility for these inaccuracies and committed to resolve them . . . Unfortunately very little improvement has taken place with repeated mistakes still occurring.

\*    \*    \*

Your performance regarding this matter is unacceptable. Understand that you are personally responsible for all production reporting . . . While it is clearly understood that you delegate this element of work to your Team Leader, you still own it as the Supervisor[.]

While mistakes due [*sic*] happen, your failure to catch them is based upon the fact that you simply are not checking for them even after repeated discussions to do so. Informal meetings, casual conversations, coaching, suggestions, please and thank you etc . . . have all proven to be ineffective. Future instances of repeated production reporting errors will result in Suspension for poor performance.

(Doc. 29–6 at 1).

### 3. Argument with a Fellow Supervisor

On February 8, 2013, Longoria and Judy Stacy, another Production Supervisor, got into a verbal altercation in front of the hourly employees whom they supervised. Longoria acknowledged that it was "[a]bsolutely not" appropriate for him and Stacy to have had the argument in front of their subordinates. (Doc. 29–2 at 50).

### 4. Employees' Protective Gear

In February, 2013, Longoria began supervising the third shift at the Lallendorf Road plant.

Mackie visited the plant during the third shift on February 13 and saw numerous employees who, in violation of company policy, were not wearing protective equipment. He immediately suspended Longoria for one day. (*Id.* at 50–51).

Longoria acknowledged that Mackie's observations were accurate. (*Id.* at 50). But Longoria explained that employees not wearing protective gear was an endemic problem on the third shift,

5

which he had been supervising for only one week. (*Id.*). He also claimed that he had taken some steps to rectify this issue, but he could not recall, at his deposition, what those steps were. (*Id.* at 51).

After Mackie suspended him, Longoria told Klusmeyer that the suspension was retaliation for having complained about the computer-screen incident. (*Id.* at 32–33). It does not appear that Klusmeyer investigated this complaint, either.

### 5. 2012 Performance Review

On March 1, Longoria met with Mackie to discuss his 2012 performance review, which Mackie had prepared a few weeks earlier. (Doc. 38 at 67–68).

Overall, the review was a dim one, with Longoria earning a "performance needs to be improved" rating. Mackie wrote that Longoria did not meet several objectives that Autoneum set for him in 2012. (Doc. 29–6 at 17). He also gave Longoria the worst rating – "performance needs to be immediately addressed in one way or another" – for one of those objectives, "Quality Alerts / Timely LPAs / Scrap Management." (*Id.*).

As Mackie summed things up:

> Al has good written and oral communication skills in combination with the ability to analyze situations & evaluate alternatives. I am concerned regarding Al's overall performance in 2012. Several areas are in need of improvement for 2013. Al has been in his current role long enough to know the basics yet it is the basics that Al struggles with: Production reporting, timely submission of mandatory reports, crewing scheduling, building collaborative relationships with hourly employees. Significant improvement is required in 2013.

(*Id.* at 16).

### 6. Performance Improvement Plan

On March 1, immediately after Longoria received his 2012 performance review, Autoneum placed him on a Performance Improvement Plan (PIP).

6

Longoria received the PIP during a meeting with Mackie, Klusmeyer, and Plant Manager Mike Bishop. According to Mackie, "[t]he purpose of [the PIP] is to clearly identify areas of performance that are in need of immediate improvement based upon 2012 performance results which identified an overall unacceptable level of performance that falls well below performance norms." (Doc. 29–6 at 20). Some of the areas Autoneum identified for improvement were safety, housekeeping, and completion of necessary paperwork.

The PIP was to last up to ninety days, at the end of which time Longoria would either "be removed from the plan and returned to good standing . . . or, in the event [he] was unsuccessful [his] employment would be terminated." (*Id.*).[3]

Longoria understood that if he did not agree to the PIP, Autoneum would immediately fire him. (Doc. 29–2 at 55).

### 7. Staffing and Quality Issues

In late February or early March, Mackie learned from several of Longoria's subordinates that Longoria had not staffed a critical position on the third shift. According to the employees, Longoria did not complete and post the weekly staffing schedule. As a result, one position on the shift – the gauger – went unfilled. (Doc. 29–8 at 2).

The employees also complained that, despite there bing a "a glue issue" on a gantry – which would ordinarily require that production come to a halt – Longoria ordered the employees to run the machine anyway. (*Id.*).

---

[3] Shortly after placing Longoria on the PIP, Autoneum transferred him, at his request, to its plant on Wynn Road. (Doc. 29–2 at 51). There, according to Longoria, his supervisor told him to "just keep doing what you're doing, you're doing fine." (*Id.* at 53).

### 8. Lock-Out/Tag-Out Procedures

Sometime in March or April, 2013, Longoria "wrote up and sent home and suspended" an employee named Wilhelm for violating Autoneum's "lock-out/tag-out" procedure. (Doc. 29–2 at 39).

This was a safety protocol that employees followed when they needed to repair a machine. An employee would first disconnect the machine from its power source and then try to turn it on, to make sure the machine was indeed off. Only then would the employee enter the machine and begin the repair work. (*Id.* at 41).

Wilhelm filed a grievance alleging, with his union's backing, that it "was the norm on midnights [i.e., the third shift]" for employees to violate the lock-out/tag-out procedure, and that "Mr. Longoria was well aware of it." (*Id.* at 39). Wilhelm also admitted to Klusmeyer that he had violated the procedure before while working under Longoria. (Doc. 34 at 74).

When Mackie learned of the grievance on April 10, he suspended Longoria.

Asked at his deposition whether he had any reason to doubt whether the Union had a factual basis for these concerns, Longoria responded, "I have no reason to doubt that Mr. Wilhelm with the union would have come back and said that, because I'm sure at that point he would have said just about anything to get his job back." (Doc. 29–2 at 42).

### D. Discharge

On April 12, Klusmeyer and Bishop called Longoria, who was still serving his suspension, and fired him.

They explained that Autoneum had decided to terminate his employment "in light of issues that had come up since [Longoria] had transferred to Wynn Road" – e.g., the quality issues on the gantry, the staffing issue, and Longoria's failure to ensure employees adhered to the lock-out/tag-out

protocol. (*Id.* at 57). Longoria testified that neither Klusmeyer nor Bishop mentioned the PIP when they announced his discharged. (*Id.*).

### E. Litigation

Longoria filed discrimination charges with the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission. He eventually withdrew those charges and obtained a right-to-sue letter, after which he brought this suit in 2014.

According to Longoria's amended complaint, Autoneum fired him: 1) because he is Hispanic, in violation of Title VII and Ohio law; 2) because he is Mexican, also in violation of Ohio law; and 3) in retaliation for complaining about the computer-screen incident, in violation of state and federal law. (Doc. 12–1 at 6–9).

He also alleged that supervisors Mackie and Klusmeyer were jointly liable with Autoneum for this misconduct under Ohio law. *Compare Gainer v. Cent. Transp., Inc.*, 84 Ohio St. 3d 293, 299–300 (1999) (managers and supervisors may be jointly liable, under O.R.C. § 4112.01(A)(2), with employer for employment discrimination), *with Hauser v. City of Dayton Police Dep't*, 140 Ohio St. 3d 268, 273–74 (2014) (holding that managers and supervisors in public-sector positions cannot be jointly liable with the employer for discriminatory conduct).

In a prior order, I granted the defendants' motion for judgment on the pleadings with respect to Longoria's discrimination claims predicated on a hostile-work-environment theory. *Longoria v. Autoneum N. Am., Inc.*, 2015 WL 6658675, *5–6 (N.D. Ohio).[4]

I also took note that Longoria had withdrawn his claim against Mackie. *Id.*, at *3 n.1.

---

[4] Longoria represents in his opposition brief that he "does not object to Defendants' motion for summary judgment of his harassment claims." (Doc. 39 at 2 n.1).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

Title VII prohibits employers from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see also* O.R.C. § 4112.02 (outlawing racial discrimination "with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment").

"A plaintiff pursuing . . . discrimination claims under Title VII and Ohio Revised Code § 4112.02 may prevail in one of two ways: by presenting either direct or indirect evidence to prove that his employer . . . was motivated by a [discriminatory] animus when it took an adverse employment action against him." *Jones v. Kilbourne Med. Labs.*, 162 F. Supp. 2d 813, 824 (S.D. Ohio 2000).

10

Because Longoria has offered no direct evidence, I apply "the burden-shifting, indirect evidence approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Rozek v. AMPRO Computs., Inc.*, 2016 WL 3033550, *4 (N.D. Ohio) (Carr, J.).

Under the *McDonnell Douglas* framework, the employee must first establish a prima facie case of discrimination. *Id.* Once an employee satisfies that burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer does so, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason was a pretext for intentional discrimination. *Id.*

### A. Racial Discrimination

Autoneum argues it is entitled to summary judgment because Longoria cannot make out a prima facie case of discrimination on the basis of race. According to the company, there is no evidence that would permit a jury to find that: 1) Longoria was qualified for the Production Supervisor position; or 2) a non-Hispanic worker replaced him.

Autoneum further argues that it had legitimate, non-discriminatory grounds for firing Longoria – namely, his shoddy performance in 2012 that, despite many warnings and Longoria's placement on the PIP, continued into 2013 – and that Longoria has no evidence permitting a jury to find that these reasons were pretextual.

### 1. Prima Facie Case

To make out a prima facie case of discrimination on the basis of race, the employee must show he: 1) is a member of the protected class; 2) suffered an adverse employment action; 3) was

11

qualified for his position; and 4) was replaced by a member outside the protected class. *Jones v. Toledo Pub. Schs.*, 2016 WL 1047247, *3 (N.D. Ohio) (Carr, J.).

### a. Qualifications

A plaintiff can show he is qualified for a position "by showing that [ ]he performed at a level that generally met [his] employer's objective minimum qualifications." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

"The inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc).

But a court must not "consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case," as doing so would "deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* at 574.

Here, Autoneum contends that Longoria's performance, both before the computer-screen incident and after, was unsatisfactory. (Doc. 29–1 at 25; Doc. 41 at 7–9). These reasons, and the evidence on which the company relies, essentially overlap with its non-discriminatory grounds for discharging Longoria.

"In the Sixth Circuit, however, courts treat unsatisfactory work performance as a legitimate, nondiscriminatory reason during the second stage of the *McDonnell Douglas* inquiry, and not as a prima facie factor." *Rozek*, *supra*, 2016 WL 3033550, at *4 n.6.

Moreover, the fact that the company even hired Longoria, that he continued in that position for nearly two years, and that his 2012 performance review was not universally negative tend to show he was minimally qualified for the job – or at least a reasonable jury could so find.[5]

Accordingly, I reject Autoneum's argument that no reasonable jury could find Longoria qualified for the Production Supervisor post.

### b. Replaced by a Member Outside the Protected Class

Autoneum next argues that there is no evidence that "he was replaced by someone outside the protected class." (Doc. 29–1 at 25). Rather, Autoneum contends that it parceled out Longoria's duties to other Production Supervisors. (*Id.* at 26). It also notes that "the first Production Supervisor Autoneum hired after Longoria's discharge was Ricardo Villareal, who is Hispanic[.]" (*Id.*).

In response, Longoria points to Klusmeyer's testimony that he "was permanently replaced," not by a Hispanic, but "by Shawn Durbin, a Caucasian." (Doc. 39 at 15; *see also* Doc. 34 at 109). Durbin, who had worked at the Lallendorf Road plant since July, 2012, assumed Longoria's duties at the Wynn Road plant on June 26, 2013 – one week before Autoneum hired Villareal. (Doc. 29–8 at 4–5; Doc. 41–1 at ¶3).

As the Sixth Circuit explained in *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992), "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement."

---

[5] Longoria apparently falsified his application for employment at Autoneum. As the company notes, Longoria's two prior employers fired him, but he told Autoneum that he had left on good terms. (Doc. 29–1 at 37–38). Autoneum does not rely on this evidence to argue Longoria was unqualified for his post, and thus I do not consider it.

13

Rather, "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003); *accord Morris v. Anchor Hocking, LLC*, 2012 WL 2319255, *4 (S.D. Ohio).

Under *Lilley* and *Grosjean*, then, Autoneum did not "replace" Longoria when it spread his job duties to other employees already working at the Wynn Road plant.

But it is undisputed that Autoneum eventually replaced Longoria with Durbin, a Caucasian who is outside the protected class. *Grosjean*, *supra*, 349 F.3d at 336 (assigning another employee to perform the plaintiff's duties is a "replacement"). Nevertheless, I conclude that a reasonable jury could not find that this amounted to "replacing" Longoria with someone outside the protected class.

Autoneum fired Longoria on April 12, 2013, but it did not assign his former position to Durbin until June 26 – seventy-five days later.

If it is true, as Longoria alleges, that the company fired him solely because he was Hispanic and he had complained about discrimination, one wonders why the company did not bring in a non-Hispanic once it was rid of him, or shortly thereafter. Instead, the company made do for two-and-a-half months by spreading Longoria's responsibilities to other workers, forcing them to come in early or stay late to cover his shifts. (Doc. 33–1 at 12) (description of how Autoneum spread Longoria's duties to other employees).

This gap between Longoria's firing and replacement does not support a prima facie case of discrimination. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 941 (6th Cir. 1987) (three-month delay between plaintiff's firing and replacement's hiring "substantially weakened" the plaintiff's prima facie case); *Speck v. Agrex, Inc.*, 888 F. Supp. 2d 867, 879 (N.D. Ohio 2012) (Zouhary, J.) (five-month interval between plaintiff's discharge and replacement did not support prima facie case).

14

For this reason alone, Autoneum is entitled to summary judgment on Longoria's racial-discrimination claim. But even assuming that Longoria had made out a prima facie case, Autoneum would still be entitled to summary judgment on the pretext prong.

### 2. Pretext

Autoneum has provided a legitimate, nondiscriminatory reason for Longoria's discharge.

The company had warned Longoria about his performance issues as early as September, 2012, when Mackie issued the Letter of Concern. Thereafter, Mackie and Autoneum either criticized or formally disciplined Longoria for improperly assigning overtime shifts, not issuing production reports, fighting with a coworker, and failing to enforce safety rules.

In light of Longoria's dim 2012 performance evaluation, Autoneum placed him on a PIP that required him to improve his performance. Due to his failures thereafter, the company first suspended him and ultimately terminated his employment.

"Poor performance is a legitimate reason for discharging an employee." *Rozek*, *supra*, 2016 WL 3033550, at *4.

Accordingly, the burden shifts to Longoria to show that these reasons were pretextual.

"Pretext may be established either directly by persuading the fact-finder that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Speck*, *supra*, 888 F. Supp. 2d at 879 (internal brackets and quotation marks omitted).

To establish pretext, the plaintiff "must show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the employer to take the

adverse employment action], or (3) that they were insufficient to motivate discharge." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).

"When an employer offers more than one independent, legitimate, non-discriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment." *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 477–78 (6th Cir. 2012).

### a. Violation of the Lock-Out/Tag-Out Procedure

Longoria first contends that no evidence supports Autoneum's determination that he was responsible for Wilhelm's violation of the lock-out/tag-out procedure. (Doc. 39 at 19).

To begin, this is not an entirely accurate characterization of Autoneum's ground for dismissing Longoria. Rather, the company determined more broadly that Longoria allowed violations of the lock-out/tag-out procedure to become the norm during the third shift. Longoria admitted, moreover, he had no basis to question the Union's allegation along those lines.

In any event, Autoneum could reasonably have looked to Wilhelm's violation of the lock-out/tag-out procedure, which did occur on Longoria's watch, as some indication of Longoria's failure to supervise his workers properly. Indeed, Wilhelm admitted that he had previously violated the lock-out/tag-out procedure under Longoria's supervision, and it is uncontested that such violations expose workers to a substantial risk of death or serious injury.

Most importantly, however, Longoria ignores the evidence that the lock-out/tag-out issue arose only after Autoneum had, in light of his documented performance issues, placed him on a PIP.

According to the PIP, Longoria had "an overall unacceptable level of performance" with respect to ensuring the safety of the employees under his supervision. Longoria testified, moreover,

16

that he had not: 1) issued discipline notices in a timely fashion or complied with company policies re. disciplinary notices; 2) evaluated employees under his supervision; 3) assigned overtime shifts according to seniority; 4) issued production reports that conformed to his supervisor's clearly conveyed expectations; and 5) ensured his employees wore required protective gear.

It is true, as Longoria observes, that neither Klusmeyer nor Bishop mentioned the PIP when they fired him. But this omission did not create a "shifting sands" situation in which Autoneum changed or contradicted its reasons for firing Longoria. *E.g.*, *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 540–41 (6th Cir. 2014).

At its core, Autoneum's ground for firing Longoria was, and always has been, unsatisfactory performance.

When Bishop and Klusmeyer fired Longoria, they cited two instances of unsatisfactory performance: the lock-out/tag-out issue and the quality issue (i.e., the staffing error and the machine/glue issue). The PIP – to which Longoria agreed in order to save his job – stated that the company would fire Longoria if his performance did not improve. And the PIP referred specifically to Longoria's rather dim 2012 performance review, which itself documents Longoria's many instances of poor performance.

Finally, Longoria has pointed to no instance where someone at Autoneum gave a reason for firing him unrelated to his documented performance concerns.

Longoria does not rely on any inconsistencies between Mackie's, Bishop's, or Klusmeyer's testimony, the principal decision-makers with first hand-knowledge of Longoria's record. Instead, he points to testimony from Debra Ruwart, Autoneum's Corporate Vice-President of HR. (Doc. 37 at 2). Ruwart had no personal knowledge of Longoria's performance issues; she relied on

17

the information Klusmeyer and Bishop gave her in deciding whether to approve their request to fire Longoria. (*Id.* at 9).

Ruwart testified that she did not know, before Autoneum fired Longoria, that he had complained about racial harassment. (*Id.* at 15). Asked how she could have ensured that Autoneum did not fire Longoria for a discriminatory reason when she did not know about Longoria's complaints, she responded:

> Again, I think, as I stated, there was enough information regarding his – his performance as a supervisor. We had attempted to move him to different areas to help him be successful in his role as a supervisor. That did not – that did not change his performance. He had been given opportunity to improve his performance, and he did not. That was the reason for his termination.

(*Id.* at 18–19).

In an entirely undeveloped argument buried in a footnote in his brief (Doc. 39 at 9 n.2), Longoria suggests that this explanation "is wildly different from Defendant's present account."

Yet Longoria does not bother to explain how, exactly, Ruwart's testimony is inconsistent with Autoneum's "present account" of its reasons for firing him. Rather, Longoria seems to imply that Ruwart's reference to moving Longoria to "different areas to help him be successful" means that Autoneum fired Longoria solely because his performance did not improve after his transfer to the Wynn Road Plant.

But that is an unreasonable interpretation of Ruwart's testimony.

First, it is unclear what Ruwart meant when she said Autoneum had "move[d]" Longoria to "different areas" without seeing a hoped-for change in performance. Second, and more importantly, she twice identified, with specificity, what she believed, based on her discussions with Klusmeyer and Bishop, to be the basis for the company's decision to fire Longoria: his consistently poor and

18

unimproved performance. (Doc. 37 at 16) ("the information that I was given regarding the pattern of his performance and his inadequacy as a supervisor was enough to warrant the termination"); (*id.* at 18–19) ("He had been given opportunity to improve his performance, and he did not. That was the reason for his termination.").

That explanation, of course, is consistent with both Klusmeyer's and Bishop's explanation and the company's position in this litigation.

In these circumstances, no reasonable jury could find that Autoneum's reliance on Longoria's failure to ensure that his workers adhered to the lock-out/tag-out procedure was pretext for discrimination. Because this reason alone justified Longoria's discharge, Autoneum is entitled to summary judgment. *St. Jude Med. S.C.*, *supra*, 504 F. App'x at 477–78 (employer's single non-pretextual ground for discharge warrants summary judgment, even if second ground for discharge was pretextual).

### b. Quality and Staffing Issues

Longoria next challenges Autoneum's determination that there was a "quality issue" concerning a machine with glue issues and a staffing problem.

Longoria ignores the latter issue entirely, however, and he cites no evidence tending show that he had, in fact, filled the gauger position, contrary to the allegations of his subordinates. *Compare* Doc. 39 at 11–12, 19–20) (discussion in Longoria's opposition brief citing no evidence that he filled the gauger position), *with* Fed. R. Civ. P. 56(c)(1)(A) (obligating non-movant to cite record evidence showing material factual dispute).

19

Regarding the glue issue, Longoria contends the company failed to give him a chance to address the allegation, and that it failed to take disciplinary action soon after the problem came to light.

But arguments that the company's investigation was not as robust as it ought to have been are insufficient to show pretext. *Loyd*, *supra* 766 F.3d at 590–91 ("An employer's pre-termination investigation need not be perfect in order to pass muster under the [honest-belief] rule.").

This is especially true, given the lengthy record of performance issues that Autoneum managers documented, discussed with Longoria, and urged him to correct. Such ongoing performance issues rebut any inference of pretext, which is non-existent here. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (evidence of ongoing performance problems rebuts inference of pretext).

As the Sixth Circuit explained in *St. Jude Med. S.C.*, *supra*, 504 F. App'x at 477:

> As long as an employer has an honest belief in its proffered nondiscriminatory reason, the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. The key in assessing whether an employer had an honest belief is whether the employer made a reasonably informed and considered decision before taking an adverse employment action . . .We do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Instead, a plaintiff must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.

(internal quotation marks and citations omitted).

Here, there is no evidence permitting a reasonable jury to find that Autoneum made anything but a reasonably well-informed decision that Longoria's ongoing, documented, and in most instances uncontested performance issues warranted his firing.

20

Accordingly, Autoneum is entitled to summary judgment on the pretext prong as well.[6]

## B. Perceived-National-Origin Discrimination

Longoria's opposition brief makes clear that his national-origin claim under Ohio law is, in fact, a claim that Autoneum discriminated against him on the basis of his "perceived" Mexican national origin. (Doc. 39 at 14–16).

It is undisputed that Longoria is of American origin, having been born in Texas.

He nevertheless contends that "it was no secret" at Autoneum that "he is Mexican-American." (*Id.* at 15). That assertion flies in the face of Longoria's own deposition testimony that he never told anyone at Autoneum that he considers himself Mexican-American or that his father was born in Mexico. (Doc. 29–2 at 5, 12).[7]

In any event, Longoria cites no Ohio case law that has validated, or even discussed, this theory of liability. Because Ohio courts generally took to Title VII cases when applying O.R.C. § 4112.02, I conclude that the Ohio courts would not recognize a perceived-national-origin-discrimination claim, given its widespread failure in the federal district courts. *E.g.*, *Burrage v. FedEx Freight, Inc.*, 2012 WL1068794, *5 (N.D. Ohio) (Lioi, J.) (collecting cases and recognizing

---

[6] Because the standards for a race-discrimination claim are the same under Title VII and Ohio law, my analysis applies equally to Longoria's state-law claim. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). And because the state-law claim against Autoneum fail, so does the individual-capacity claim against Klusmeyer.

[7] Longoria also misrepresents both Mackie's and Bishop's testimony on this issue. (Doc. 29 at 2). Contrary to the assertion in Longoria's brief that Mackie always knew Longoria was of Mexican origin, Mackie actually testified he did not know until the day before his deposition – two-and-a-half years after Longoria left Autorneum – that Longoria was "Mexican-American." (Doc. 38 at 24). Bishop testified similarly that he "wouldn't know" whether it was a "secret to anyone in human resources or supervision . . . that Al Longoria was a Mexican." (Doc. 33 at 86).

that Title VII protects members of protected classes, not those whom others perceive to be in protected classes).

Accordingly, this claim fails as a matter of law because: 1) it does not state a valid theory of liability; and 2) there is no genuine dispute of material fact on the pretext prong, as discussed above.

## C. Retaliation

"Title VII prohibits employers from discriminating against an employee 'because he has opposed' an unlawful employment practice or 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' about such a practice." *McCowen v. Village of Lincoln Heights*, 624 F. App'x 380, 383 (6th Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)).

Ohio law contains a similar prohibition. *See* O.R.C. § 4112.02(I).

"When plaintiffs allege retaliation under both laws and present circumstantial evidence to prove their case . . . we analyze the two claims under the same test." *McCowen*, *supra*, 624 F. App'x at 383.

To make out a prima facie case, Longoria must show that: 1) he engaged in protected activity; 2) Autoneum knew of that activity; 3) he suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse action. *Id.* The burden then falls to Autoneum to articulate a legitimate, non-discriminatory reason for its actions. Finally, Longoria must introduce evidence that "the asserted reason is pretextual." *Id.*

Even assuming Longoria can make out a prima facie case, he cannot, for the reasons already given, show pretext. Accordingly, Autoneum is entitled to summary judgment on the state and federal retaliation claims as well.

### D. Claims Against Autoneum America Corporation

Finally, Longoria has named Autoneum American Corporation as an additional defendant.

However, there is no dispute that only Autoneum North America hired and fired him, and Autoneum itself has no connection to Autoneum America Corporation besides a parent-subsidiary corporate relationship. Furthermore, Longoria did not name Autoneum America Corporation in his administrative charge.

For all these reasons, Autoneum America Corporation is entitled to summary judgment on all of Longoria's claims.

### Conclusion

It is, therefore, ORDERED THAT defendants' motion for summary judgment (Doc. 29) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

23